## Howard et al. v. Ramsey et al.

Feb. 4, 1944.

As Modified on Denial of Rehearing

March 24, 1944.

Golden & Lay for appellants.

E. B. Wilson and James M. Gilbert for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

An instrument probated as the will of Henry Howard devised his estate equally to his wife and brother, Noah Howard. It was contested upon the grounds of forgery and, alternatively, of mental incapacity and undue influence. We reversed a judgment sustaining the will because the court had erroneously required the contestants to elect as between their allegations of forgery and of incapacity and influence. Ramsey v. Howard,

289 Ky. 389, 158 S. W. (2d) 981. On a second trial the jury disagreed. On the third trial the verdict was that the instrument had been forged. This appeal is from the judgment rendered thereon.

The contestees have maintained that the question of forgery became res adjudicata in their favor because our opinion affirmed the judgment that the instrument was a genuine will and reversed it only that the questions of mental incapacity and undue influence might be tried. We have been quite surprised that our opinion was so unclear as to afford such a construction. The surprise becomes amazement that counsel should remove a sentence from its context and use that isolated statement as the basis for their pleas and arguments, and that they should ignore the explicit statement that it was not necessary for us to consider the question of the sufficiency of the evidence with respect to the issue of forgery, a point which had been made on the appeal. In disposing of several questions of pleading and practice raised by the then appellants, contestants, we wrote a "bit of background" or a short narrative of the historical development of procedure in will contests. In the middle of the paragraph describing the practice in Kentucky under an Act of 1797, we wrote: "The issue whether the writing produced was the last will of the testator or not was tried by a jury and binding on all concerned." Counsel for the appellants pick this out and use it as if it were deciding the case at bar. We confess that our opinions are not always clear, but we think that is a tortious construction of this one. Perhaps in the exercise of an inherent power the court might have regarded the question of forgery as having been determined by the verdict and have directed a re-trial confined to other questions, but we did not. It is perceivable that on an issue of forgery the consideration by the jury may be affected by evidence of mental weakness or incapacity of the alleged testator and of mental strength or undue influence of a beneficiary, presenting a picture of the parties and their characteristics, their situations, relations and motives. The Court of Appeals was once authorized to try "both law and fact" in a will contest and direct a judgment, but this was changed by the General Statutes, enacted in 1873. Since then the same consideration is given a verdict in a will case as in any other. Broaddus' Devisees v. Broaddus' Heirs, 10 Bush 299, 73 Ky. 299; Sec. 4850, Ky. Stats., KRS

394.290. Under that rule we have directed a judgment sustaining a will where the evidence was conclusive. Hildreth, Executrix, v. Hildreth, 153 Ky. 597, 156 S. W. 144. Upon rare and extraordinary occasions judgments in common-law actions have been reversed with directions to limit the issues to be tried. But our opinion and mandate in this case reversed the judgment without qualification. The trial court properly and rightly regarded the reversal of the judgment as requiring a new trial. Preece v. Woolford, 200 Ky. 604, 255 S. W. 285.

Although, as we have said, the contestants obtained a reversal of the first judgment because they had been compelled to confine their contest to the issue of forgery, yet on the re-trial they abandoned the other issues and submitted only the question of forgery. The appellants charge them with bad faith in thus procuring a reversal of the judgment, and submit they should not have been permitted to re-try that question. It is not for the court to indulge in such an inference and hold it precluded the re-trial. The contestants proceeded within their legal right.

The appellants insist that the judgment should be reversed because the verdict is flagrantly against the evidence.

The alleged testator, Henry Howard, had no children and was survived by his widow and numerous brothers and sisters and their descendants. It appears that he and his brother Noah had been quite intimate, while he and two or three of his sisters and brothers were unfriendly. Some of the litigation of this large family is to be found in Cary-Glendon Coal Company v. Carmichael, 258 Ky. 411, 80 S. W. (2d) 29, and the two previous cases referred to therein. Henry's attitude toward two of his sisters and their families is exemplified, by his statement, according to a witness that he did not want them ''to have nary thing in the world he had, not even a piece of cornbread that fell from his table.''

The evidence of the propounders was that Henry had procured Noah to write his will at his home in August, 1933, about two years before he died, and that it was witnessed by John C. Howard, his brother, and Walter Polly, a hired hand. Polly insisted it had been written by Henry himself, thereby contradicting Noah and John. And Polly made an affidavit that the whole matter had been fixed up by Noah after Henry's death.

To avoid the effect of this, Polly testified that he was drunk when he made the affidavit and that his memory was poor, as he had been knocked in the head twice and shot in the head once; that part of his skull had been taken out and he had lost some of his brains. He admitted two or three convictions of felony.

The proof of the contestants is in substance and effect that shortly after Henry was buried, perhaps the next day, Noah and John accompanied the widow and her brother, Lee North, to examine the deceased's safety box in a bank in Pineville, and that neither of them then knew whether or not he had made a will. When none was found in the box, Noah was worried and stated that ''We will just have to make one'' or that he would make one. This is testified by the widow, to whom was devised one-half of the estate, and her brother, who lives in Harlan County, and who seems to have been friendly with the entire family. The next day, according to the widow, Noah brought the paper to her home and had her sign her deceased husband's name to it. The paper was left with her until it was signed by Polly and later by John Howard as witnesses. Subsequently, Noah had tried several times to influence North to testify for him, and particularly to say that he had found the will in the safety box, or that he, North, had had the will in his pocket when they were in the bank. Noah and County Judge Bingham had gone to the clerk's office late one afternoon to see the probated will. According to the county clerk and his deputy, when the clerk started to get the instrument Noah said he knew where it was and got it himself from the file. A thorough search for the will was made by the clerk and his deputies several days afterward, but the will could not be found. The last seen of it was when it was in the hands of Noah. As a consequence of its disappearance there was never any comparison of signatures or expert opinion with respect thereto.

For the contestees there were categorical denials of the foregoing and the inferences which the several statements of fact permitted. Judge Bingham testifed that he had obtained the will for examination in the clerk's office and that Noah never had his hands on it. Noah had become sick and left the room and he, Bingham, had delivered the paper back to the clerk, who put it in the drawer from which he got it. He and Noah had

also examined the record. Judge Bingham further testified that when the paper had been offered for probate "I was juberous of it, and I asked her [the widow] for that reason to be sure it was genuine." She had been sworn and testified that it was Henry's handwriting. The Judge also knew Henry's handwriting and testified that he had written it. The record is not clear, but apparently he was referring only to the signature. The widow, who had re-married, had sold her entire right in the estate to Noah and his wife for $2,000. Her deed, dated November 27, 1937 (more than three years before the contest was filed), stated the will as the source of her title. She also admitted that after the contest had been instituted two of the sisters and a brother had transferred their interests in Henry's estate to her. Several witnesses testified to statements of the alleged testator that he had made a will and regarding his dislike of three of his sisters.

It may be put down by way of rebuttal that the widow had testified that Noah and John had hounded and stayed with her, and that she had not acted freely in selling Noah her rights in the estate. It appears that while Henry had paid for building the house in which he lived, it was located on land owned by Noah, and that there was a lawsuit between him and the widow in relation thereto; also a suit involving a settlement of Henry's estate according to the will. It was claimed the conveyance was made in settlement of these suits. The widow testified that she knew nothing about the language in the deed or the pleadings which referred to the will as the source of her title because her lawyer had prepared them.

There is much other subordinate and collateral evidence, but the foregoing is the essential part. We are of opinion that the verdict is sustained by the evidence.

Another ground upon which reversal is asked is misconduct of counsel for the appellees. In his opening statement the attorney stated that America Ramsey, a sister and contestant, was dead and that Noah Howard "could tell the jury how that happened." On cross-examination of the wife of John Howard, counsel asked her this question: "Did you know Noah Howard stabbed his sister, America Ramsey, in the back?" The contestees objected in each instance and the objection was sustained. They also moved the court to set aside the

swearing of the jury and continue the case. The motions were overruled and the court admonished the jury that they should "not consider the question about stabbing his sister." The statements were highly improper. There is nothing in the record tending to support the attorney's action. By no means can the conduct be condoned. We have recently had occasion in several cases to deprive a party of the fruits of victory where his counsel had deliberately made grossly improper statements before the jury, or apparently got them made, even though the court had admonished the jury not to regard them. The trend of all the courts has been to "tighten up" against such unfair practices. However, the evidence in this case is so convincing that the will was forged, that, considering the admonition of the court and the entire record, we feel it was not a prejudicial error to overrule the motion to continue the case or to set aside the verdict upon this ground.

The judgment is affirmed.